BEN DOOM'S EX'RS *v.* BEN DOOM'S DEVISEES.

**Wills—Construction.**

A will charging devisees with the payment of the debts of the testator and providing for equalizing of his children, construed.

**Husband and Wife—Contract by Wife.**

Where a married daughter of a testator contracted with the executor for the purchaser of a house and lot belonging to the estate, and agreed that the purchase price should be taken out of her portion of the estate as it becomes payable, and the property was occupied by the daughter and her husband as a home, the transaction was held not void on the ground of coverture.

**Husband and Wife—Ratification of Contract by Wife After Removal of Coverture.**

Where a married woman, during coverture, purchased a house and lot for a home, and continued to hold the property for many years after removal of coverture, it amounted to a ratification of the contract.

APPEAL FROM NELSON CIRCUIT COURT.

April 27, 1874.

OPINION BY JUDGE PETERS:

The main question presented by this appeal is the proper construction of the will of Benjamin Doom, who died in the county of Nelson in January, 1854, the chief difficulty growing out of the fourth and ninth clauses of said will.

After a careful examination of the whole will, we can not doubt that it was the intention of the testator, and that he did, by the fourth clause of his will, pass to his two sons, James M. Doom and Wm. H. Doom, the absolute title to all his interest in his tanyards, including his bark, or knob lands, his saddler shop, and all the property, both real and personal, pertaining to or constituting a part of

said tanyards and saddler shop.   He also charged them with the payment of his debts including his individual debts, and his part of his unpaid debts of the firms of B. Doom & Sons and of Ben Doom & Sons, for he declares that they, his said sons, are to pay all his just debts, whether the same be more or less, and with the devise to them to take all his liabilities; and upon the payment of his debts, they are to be released from any further liability to any one. If all the debts of the testator were paid, to whom could his sons be further liable for what remained of the estate disposed of in that clause of his will, and to which he certainly referred?   The answer must be, to no one but his other devisees, the appellees; and if he, in terms, has declared that after the payment of his debts, his said sons were to take the property designated, free from liability to any one, the title must have vested absolutely in the sons, unless that devise is qualified or defeated by a subsequent clause.   This condition appellee insists is occasioned by the ninth clause, which reads as follows: "It is my will and devise that my executors sell, or divide as they think best, all my estate, both real and personal, not heretofore devised in this will, among my children, and they are hereby authorized to convey and confirm such division or sale; and the sale or division shall be equal among my children now living, taking into view the division heretofore made by me, and taking into this calculation the amount of money I have paid, or am bound as security or otherwise to pay for Dr. H. W. McCann."

This clause authorizes his executors to sell or divide such of his estate as he had not by his will previously disposed of.   Such of his estate, both real and personal, as he had disposed of in the previous clauses of his will, his executors were not authorized either to sell or divide; they could not touch or interfere with any such; but what remained undisposed by antecedent clauses, passed by the ninth clause.

This residue was to go to his three children; but in this partition or distribution, the value of the devise to each one in the preceding clauses was to be considered; and out of this residue their shares were to be equalized; but the debts which he had paid and was bound to pay for Dr. McCann were to come out of Mrs. McCann's part.

He therefore fixed the value of the tanyard properties, bark lands, saddler shop, etc., at $38,300, and if, after paying his debts, an amount of $38,300, the valuation put on said estate, remained to be

divided, which would give each of his sons more than the property devised to his daughter, including the debts paid and to be paid for her husband, then, out of the residue, she was to be made equal to them; and if, on the other hand, the property devised to her was of greater value than each of her brothers would get out of the tanyards, etc., valued at $38,300, after payment of the debts of testator, they were to be made equal to her, and the remainder equally divided among all of them.

As to the four slaves at the tanyards, viz., Nelson, Jack, Felix and George, they did not pass by the fourth clause of the will to the sons of the testator, nor were they their property; but they pass by the ninth clause of the will; and as James M. and Wm. H. Doom claim them, and refuse to divide or to sell them, they should be charged with their value at the death of the testator, and with interest on that value which Mrs. McCann would be entitled to. But if, of the estimated value of the tanyards, etc., $38,300, enough remains to make more to her brother than she got under the third clause of her father's will, James M. Doom and Wm. H. Doom should account to her out of the valuation of said slaves, to make up her devise equal to theirs; but if theirs were not equal to hers, they should be equalized out of the value of said slaves, and the residue of their value, if any, be equally divided between the three devisees, Mrs. McCann to be allowed interest upon her part from the death of testator until paid.

Nor can this court concur with the court below in sustaining Mrs. McCann's plea of coverture, and setting aside her contract for the purchase of the house and lot in Bardstown from G. M. Doom. On June 7, 1856, Mrs. McCann and her husband then being without a house, she having just before that time lost the house devised to her by her father by fire, contracted with G. M. Doom for a house and lot in Bardstown suitable for a dwelling for them, took possession of the property, and occupied it as a dwelling. She and her husband agreed to pay G. M. Doom $3,800 therefor, with interest from the date of the contract, to be paid out of the undistributed estate of Ben Doom, which might be going to the said Elizabeth McCann under the will of her father, the payments to be made as fast as the said Elizabeth is entitled to the distribution, and James M. Doom, one of the executors, to be credited by the price of said house as so much received by Mrs. McCann from said J. M. Doom, as executor of her part of the estate of testator; and on the same

day that said writing was executed, the house and lot were conveyed to her. The property, as is shown by the evidence, was worth the price agreed upon at the same time. A house was indispensable to her, this was suitable, and entirely satisfactory to Dr. McCann and his wife; no advantage was taken of them in making the contract; and so the title is unquestioned.

If the executors or either of them had paid to Mrs. McCann and her husband the amount in money, as part of her legacy, at which they agreed to take the house and lot, and had jointly executed their receipt for the same, it could scarcely be doubted that the payment would be valid, and their receipt a good voucher; and if that be so, there could be no reason why she could not, with her husband, accept a house so necessary, if not absolutely indispensable for her comfort, at a fair price, in place of the money, as a payment *pro tanto,* when there is no fraud or imposition in the transaction; and besides, Mrs. McCann has acquiesced in the sale and purchase too long to be permitted at this late day to repudiate it, even if under other circumstances she could have availed herself of her disability of coverture at the time of the purchase of the house and lot. She should, within a reasonable time after her disability was removed by the death of her husband, have notified the executor of her intention, and tendered the property to him. She waited too long after her disability was removed, before she took steps to disaffirm the contract. Her delay and continued occupation of the property were a ratification of the purchase after the removal of her disability.

As to so much of the assets or estate of testator as came to the hands of G. M. Doom, and were administered or disposed of by him as executor, and in which Smith did not participate, the latter could only be held responsible as the surety of G. M. Doom, having executed a joint bond with him; and so he was not sued in that capacity until December, 1872, more than eighteen years after the date of the executorial bond. He was then brought before the court by an amended petition, and he has relied on the statute of limitation as far, it seems to us, as it is an available defense, so far as it is sought to hold him responsible for the act of G. M. Doom as executor and in which he did not participate. Collins, etc., v. Carlisle's Heirs, etc., 7 B. Mon. 13.

In making up the accounts for a final settlement of the estate, the valuation fixed by the devisor of the property named and valued in

45

paper exhibit "O. K.," shall be regarded as the proper criterion of the value of the property therein named.

There seems to be no difficulty among the parties as to the partition and distribution of the proceeds of the property devised to the widow of the testator for life. That, he directs to be equally divided amongst his children, except the piano, which Mrs. McCann is to have.

It may be proper to suggest that two years should be allowed as the time in which, after the death of testator, to settle his debts; and the debts then to be deducted from the $38,300, the price fixed as the value of the tanyard property, etc., would show what the advancements under the will to the sons would be.

Wherefore the judgment is reversed, and the cause is remanded for further proceedings consistent herewith.

*McKay, James, Muir & Wickliffe, Johnson, for appellants.*

*Bush, Grigsby, for appellees.*